# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 09-CV-3581 (JFB)

————————————

ALI BESSAHA,

Petitioner,

VERSUS

DAVID ROCK,

Respondent.

————————————

MEMORANDUM AND ORDER
April 27, 2012.

————————————

JOSEPH F. BIANCO, District Judge:

Ali Bessaha (hereinafter "Ali" or "petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on March 19, 2002, in County Court of the State of New York, County of Nassau (the "trial court"), for murder in the second degree (N.Y Penal Law § 125.25(1)). Petitioner was sentenced to a term of imprisonment of twenty-five years to life.

Petitioner challenges his conviction on the following grounds: (1) the evidence was insufficient to support a finding of guilt beyond a reasonable doubt; (2) the trial court erred by permitting the prosecution to introduce evidence of prior bad acts; (3) the cumulative effect of the prosecutor's misconduct denied him a fair trial; (4) successive prosecution; (5) judicial misconduct; (6) selective prosecution; and (7) ineffective assistance of counsel.

For the reasons set forth below, the Court finds that petitioner's claims of ineffective assistance of counsel, improper admission of prior bad acts evidence, prosecutorial misconduct, selective prosecution, and judicial misconduct are procedurally barred. In any event, the Court has examined all of the petitioner's claims on the merits and concludes that there is no basis for habeas relief.

## I. BACKGROUND

### A. Facts

The following facts were adduced from the petition and documents attached thereto, as well as from the state court trial and appellate record.

On January 30, 1999, petitioner's wife Ourida Bessaha ("Ourida") was found murdered in her home in Hicksville, New York. (Tr.[1] at 677.) Petitioner and Ourida had two children, Alex Bessaha ("Alex") and Nora Bessaha ("Nora"). (*Id*.) Alex testified that he found his mother "lying on the floor next to the sofa, naked, with blood all over her face. Her face was bashed in, she had two holes in her head." (*Id*.) According to the evidence presented by the prosecution at trial, Ourida was killed between the hours of 6:30 am and 9:30 a.m. (*Id*. at 898.)

Officer Frank Geluso ("Geluso") received a 911 phone call from Alex and arrived at the crime scene at approximately 2:30 p.m. (*Id*. at 778-79.) Geluso saw Alex standing in the driveway and walked into the house with them. (*Id*. at 779.) Geluso entered the house and saw the victim unclothed, laying on her back with her face bashed in and a "couple of holes" in the head. (*Id*.) Geluso walked around the perimeter of the house to check if anyone had broken in and found that all the windows and doors were secured. (*Id*. at 780.)

Detective Bruce Schurmann ("Schurmann") arrived at the scene at approximately 4:20 p.m. (*Id*. at 785-87.) Shurmann collected various types of evidence, including serological evidence and trace evidence. (*Id*. at 801.) After walking around the crime scene, Schurmann concluded that the window was not used as a point of entry because both the interior and exterior part of the window seemed undisturbed; there were cobwebs in various locations on the window; the book case was in place and had not been moved or pushed aside; the window was locked; and there was a television with antennas on the inside

of the window which would have been knocked over if someone had entered. (*Id*. at 796-800.)

1. Evidence of Motive and Alibi

In the evening of January 30, 1999, at approximately 9:00 p.m., Detective Richard Lane ("Lane") went to petitioner's apartment to inform him of his wife's death. (*Id*. at 1116, 1119.) Petitioner went with Lane to the Nassau County Police headquarters for further questioning. (*Id*. at 1121-22.)

At the headquarters, petitioner was taken into an interview room for questioning. (*Id*. at 1122-23.) Petitioner was first questioned as to his background information. (*Id*. at 1124.) Petitioner told the officers he was Algerian, had lived in the United States for thirty years, had worked as a cab driver, owned a restaurant, and was partners with his brother in ownership of an apartment building. (*Id*. at 1124-25.) Petitioner also told the officers that he was in the midst of a divorce and that he had been ordered in 1996 to vacate the property in Hicksville where his wife lived. (*Id*. at 1137.)

Petitioner was also questioned about his whereabouts during the day on Friday, January 29, 1999. (*Id*. at 1128.) Petitioner told the officers he had gone to his attorney's office who was representing him in the divorce action. (*Id*.)

Shortly thereafter, petitioner told the officers where had been on the night of his wife's murder. (*Id*. at 1131.) According to Lane, petitioner told the officers he had gone to a restaurant called "Meli Melo," which was located in Manhattan, and was there from 11:30 p.m. to 5:00 a.m. (*Id*.) Petitioner claimed that he had been playing backgammon with Bernard Ros ("Ros"),

---

[1] "Tr." refers to the transcript of petitioner's trial.

who was the owner of the restaurant, and his friend George Courgnaud ("Courgnaud"), who later gave him a ride home. (*Id*. at 1131.) Petitioner told the officers that he had arrived home at approximately 5:15 a.m. and went to sleep at 5:30 a.m. (*Id*. at 1132.)

Petitioner told the officers he had woken up on Saturday morning at 10:15 and went to the bank to deposit a check. (*Id*. at 1134.) However, because the bank was closed, he went to the New Post Diner before going back home. (*Id*. at 1135.) Petitioner then had a conversation with a tenant named Lucy until approximately 11:00 a.m. (*Id*. at 1136.)

Petitioner told the officers that he did not have a key to the back door of the house connecting the laundry room with the garage. (*Id*. at 1140-41.) In addition, petitioner told the officers that the last time he had been to the house was in 1996, *id*. at 1137), and the last time he had driven past the house was in 1997. (*Id*. at 1141.) However, petitioner had previously given a statement that he had driven past the house six months prior with a car he rented and saw a Mercedes parked in the driveway. (*Id*. at 1142.) Lane testified that he questioned petitioner about this previous statement. (*Id*.)

Although Ros confirmed that petitioner was at his restaurant on Friday night and that they played backgammon together, Ros also testified that petitioner left with Courgnaud sometime between 3:00 a.m. and 3:45 a.m. and that the restaurant closed at 4:00 a.m. (*Id*. at 1175.) Similarly, Courgnaud testified that he was with petitioner that night and that they left around 3:30 a.m., though he stated it was "definitely before 4:00 a.m. because the restaurant closes at 4:00 a.m." (*Id*. at 1180.) Courgnaud also stated that he gave petitioner a ride home that night and

that it took approximately twenty to twenty-five minutes. (*Id*. at 1180-81.)

Furthermore, petitioner's neighbor Hikim Serkane ("Serkane") testified that he overheard petitioner talking outside with a tenant between 7:00 and 7:30 a.m. (*Id*. at 1188-89.)

2.   Evidence of Motive

During the time surrounding the death of petitioner's wife, petitioner and his wife were in the midst of a divorce, after 30 years of marriage. (*Id*. at 672.) The issue left to be resolved in the divorce action was the division of property. (*Id*. at 1350-59.) According to Ourida's attorney Martha Wisel ("Wisel"), petitioner never disclosed the existence of other bank accounts located in France during the divorce proceedings. (*Id*. at 1349.) Wisel testified that petitioner had told Ourida "I have $900,000 and you'll never see any of it." (*Id*. at 1364.) Furthermore, according to Alex's testimony, petitioner was willing to give Ourida only $50,000.00. (*Id*.) In addition, petitioner failed to comply with court orders requiring him to make maintenance payments.[2] (*Id*. at 1225.) As a result, the court appointed a receiver, Charles Mirotznik ("Mirotznik), to collect the rent from twenty-four of petitioner's apartment buildings to make the assets available to pay the court order. (*Id*. at 1271, 1354.) After various unsuccessful attempts by Mirotznik to collect the rent, it was decided that the apartment buildings

---

[2] In addition, petitioner failed to appear at a hearing scheduled for December 14, 1998 and the court issued an arrest warrant. (Tr. at 1357.) According to Wisel, she "had an understanding that he had fled the jurisdiction . . . . Although his passport was taken by the court." (*Id*. at 1357-58.) Special Agent Paul Montouri testified that petitioner had reported his passport lost or stolen, then applied for a new one, yet had subsequently traveled to France using the old passport. (*Id*. at 1331.)

were to be sold, and petitioner agreed to vacate the buildings. (*Id*. at 1271-73.) The parties were to appear in court on February 1, 1999 to execute the contracts for the sale of the properties. (*Id*. at 1274.)

On Wednesday, January 27, 1999, Alex had a conversation with petitioner about the divorce settlement and the contract petitioner was to sign. (*Id*. at 683-84.) According to Alex's testimony, petitioner became agitated and stated, "you know what she needs, what she needs is a bullet in the head." (*Id*. at 685.)  In response, Alex told petitioner that he would end up in jail if he did anything. (*Id*.)  Petitioner responded by saying, "I'm not afraid of jail. You think I'm afraid of jail?" (*Id*.)

Subsequently, on January 29, 1999, petitioner called Alex and asked him if he would come to court on February 1, 1999 to testify that his mother was willing to settle for less. (*Id*. at 687.)  However, Alex informed petitioner that she was unwilling to settle for less. (*Id*. at 688.)  Petitioner then responded, "[o]kay, you don't have to come on Monday" and hung up.  (*Id*. at 688.)

3.   Evidence of the Injuries

Barton Epstein ("Epstein"), a blood splatter specialist, examined the blood stains found at the murder scene and found there were a number of blows to the victim's head and forehead. (*Id*. at 858.)

Dr. Mella Leiderman ("Dr. Leiderman"), a forensic pathologist, examined two exhibits of the victim's brain and skull and the number of blows applied to the head to determine the "rage of the individual who killed [the victim]". (*Id.* 909-910.) The photo demonstrated the damage to the brain as a result of those blows. (*Id*. at 909.) Dr. Leiderman observed, "the most striking

injury was to her face.  Her face had multiple injuries of blunt trauma that left [the] side of the face sunken." (*Id*. at 907.) Dr. Leiderman concluded that "a punch is not able to do it." (*Id*. at 924.)  On re-direct, Dr. Liederman stated that in his opinion "the injuries to her face could have been caused by a tire iron." (*Id*. at 926.)

4.   Evidence of the Footwear Impression

A footwear impression was found in the victim's blood at the murder scene. (*Id*. at 1003-04.)  Subsequently, Detective Scott Kovar ("Kovar"), an expert in footwear impression analysis,[3] executed a search warrant at petitioner's apartment and recovered a shoe from petitioner's closet. (*Id*. at 1011.)  Kovar testified that the shoe recovered was "pretty clean" and "the only thing that was on the shoe was some gummy-like material with some rocks and possibly some fibers embedded between some of the tread elements." (*Id*. at 1014.)

Kovar then took a test impression of the shoe to determine if there was an individualizing characteristic in the impression. (*Id*. at 1018.)  According to Kovar, the darkened spot on the footwear impression found in the victim's blood corresponded "perfectly with the gum and the rocky-like material that was embedded between the tread elements." (*Id*.)  Kovar further testified, "[T]he location of the spot tells me that the shoe must have had something there that would receive a little more blood and put a darkened impression there." (*Id*.)  From this, Kovar concluded that the shoe recovered from petitioner's closet "could have made the impression." (*Id*. at 1019.)

---

[3]  Kovar has eighteen years of experience with the Scientific Investigations Bureau and has examined "thousands" of footwear items. (Tr. at 1003-04.)

DNA was then taken from the gum material removed from the shoe and examined for the presence of blood, which was negative.[4] (*Id*. at 979.) Dr. Richard Saferstein ("Dr. Saferstein"), a forensic science consultant, examined the footwear impression and found there was a point of comparison between petitioner's shoe and the impression. (*Id*. at 1607-11.) However, because the piece of gum removed from petitioner's shoe turned out to be negative for blood, Dr. Saferstein concluded that it was "more likely than not that this shoe did not make the impression."[5] (*Id*. at 1607-11.)

On cross-examination, Dr. Saferstein agreed that the sole of the shoe could have worn off between the date of the murder and the date the shoe was recovered. (*Id*. at 1632.) Furthermore, Dr. Saferstein acknowledged that in order to properly examine the imprint found in the blood, the imprint would have to be raised with amidol black (*Id*. at 1635.), yet testified that he had never used amidol black to enhance a faint bloody footwear impression.[6] (*Id*. at 1624.)

5.    Evidence of the Hair

Hairs were removed from the carpet at the murder scene and were given to Dr. Vito Schiraldi ("Schiraldi"), a forensic microscopist, for comparison. (*Id*. at 1021.) Dr. Schiraldi examined the hairs under a stereo light microscope and found "most of these hairs, in fact, just about everyone of them was consistent with the deceased." (*Id*. at 1036-37.) According to Dr. Schiraldi, the unknown and questioned hair removed from the carpet was "clean". (*Id*. at 1043-44.)

Of the hairs that were removed from the carpet, Dr. Schiraldi found that "one of a thousand hairs was dissimilar to the deceased's scalp hair" and "the root portion was very similar" to petitioner's hair. (*Id*. at 1039.) However, Dr. Schiraldi recommended that the hair be sent out for DNA analysis because there were portions that he "[d]idn't feel quite comfortable enough . . . to say this hair could have originated from the scalp of Ali Bessaha." (*Id*. at 1039.)

Dr. Schiraldi then sent the hairs to Dr. Terry Melton ("Dr. Melton"), an expert in genetics and mitochondrial DNA analysis, for further examination. (*Id*. at 1068.) According to Dr. Melton's testimony, very old hairs do not generally have DNA whereas freshly deposited hairs are likely to have more DNA. (*Id*. at 1090.) Dr. Melton found there was a common base at every position between the questioned hair and known samples and concluded that "the hair could have come from Mr. Bessaha." (*Id*. at 1084.)

Subsequently, Stephanie L. Smith ("Smith"), a forensic chemist, received a call from Inspector Carl Sclafani, ("Sclafani"),

---

[4] According to Morgan Clement ("Clement"), the technical director of the Forensic Identifying Testing Department at Laboratory Corp., the piece of gum "could not have originated from the deceased nor from Mr. Bessaha." (*Id*. at 980-93.) However, Clement also found there was "no DNA or insufficient quantities to develop a profile from the shoe." (*Id*. at 993.) On cross examination, Clement testified that she was given petitioner's blood and tested it against all the samples and found nothing consistent between petitioner's DNA and any of the samples. (*Id*. at 1000.)

[5] Dr. Saferstein testified that "[t]he characteristics were insufficient to either link the shoe or to not link the shoe to that impression" and "[t]he results were at best inconclusive." (*Id*. at 1609.)

[6] Dr. Saferstein also revealed on cross examination that he was not certified by the American Society of Crime Laboratories Directors ("ASCLAD") as a footwear impression examiner, that he wasn't familiar with the requirements for expert bloodstain analysis under ASCLAD, and that he had never gone

to a crime scene to observe a bloody footwear impression. (*Id*. at 1617-18, 1625-26.)

requesting that she examine the hairs recovered from the victim's body and determine whether the questioned hair was associated to petitioner's hair. (*Id*. at 1570, 1573.) Smith determined that the hairs from the body and those found adjacent to the couch did not originate from petitioner. (*Id*. at 1693.) Smith testified that "none of the hairs were consistent with the standard of Mr. Bessaha" and that they were "flagrantly different from his head hair standard." (*Id*. at 1575.)

However, on cross examination, Smith, "qualified that the head hair standard that was provided on Mrs. Bessaha was a poor standard" and that it was not her "practice to make a definitive statement about associating a hair back to a particular person when the standard stinks." (*Id*. at 1697.) Despite this concern, Smith did not conduct any further testing beyond microscopic comparison and never examined the particular hair that was connected to petitioner. (*Id*. at 1692-6.) According to Smith, she was "unaware of whether it was meaningful to associate the hairs of a dead person back to the dead person." (*Id*. at 1697.) Furthermore, Smith acknowledged that, without connecting those unknown hairs to the victim, it could be possible that she had the hair of a suspect but that a DNA analysis would be required to determine such.[7] (*Id*. at 1697-98.)

6. Evidence of the Key

On April 7, 1999, Alex found a blue duffel bag at petitioner's apartment. (*Id*. at 691.) Several keys were found inside the duffel bag. (*Id*.) According to Alex, "one of the keys could open the backdoor itself." (*Id*. at 739.) Alex then brought the duffel bag along with its contents to Inspector Sclafani. (*Id*. at 693.)

On March 3, 1999, Inspector Sol Farash ("Farash"), a U.S. Postal Inspector for the Postal Service, executed a search warrant at defendant's apartment. (*Id*. at 1395.) Farash testified that the search was a joint investigation with the Nassau County Homicide Squad, who was investigating the murder of Ourida. (*Id*.) The search warrant permitted Farash to search for banking records, passports, and clothing with either blood or excrement on it. (*Id*. at 1396.) Farash testified that the search warrant was updated during the search and permitted him to search for additional items such as cash and keys. (*Id*. at 1396-97.) Among the items found in petitioner's closet were shoes, tools, and keys. (*Id*. at 1398.) The keys were placed in a cellophane envelope to be sent to Sclafani. (*Id*. at 1399.)

On March 5, 1999, Inspector Scalfani gave the keys to Inspector John McDermott ("McDermott"). (*Id*. at 1407.) McDermott testified that he was given "possibly over a hundred keys from Sclafani." (*Id*. at 1407-09.) McDermott went to the house in Hicksville and tried every key. (*Id*. at 1408.) He first tried the keys in the front door and none of them opened. (*Id*. at 1412.) McDermott then went to the rear door and tried every key and testified that "the second to last key was the key that turned the lock." (*Id*.) According to Sclafani, the key opened the lock that was on the door leading from the laundry room into the garage. (*Id*. at 1431.)

---

[7] Smith testified on cross examination that she was not ASCLAD certified, worked on less then six murder cases, had never testified as an expert in hair microscopy (*Id*. at 1674-83.), and had never been to the crime scene or examined the body of the victim. (*Id*. at 1703.)

### B. Procedural History

#### 1.    State Court Proceedings

##### a.    *Huntley/Ventimiglia* Hearing

On January 14, 2002, Judge Joseph C. Calabrese held a *Huntley/Ventimiglia* hearing to determine whether statements made by petitioner to Detective Lane at the Nassau County Police Department Homicide Squad should be suppressed and whether the search had exceeded the scope of the search warrant. (PTR[8] at 1-2.)

During pre-trial hearings, the prosecutor informed the court that he would seek to introduce evidence showing that petitioner had committed various criminal acts during the course of the matrimonial action, in order to prove that petitioner had motive to murder his wife. (*Id*. at 61.)  The criminal acts included fraud, criminal contempt, passport fraud, perjury, and false sworn statements. (*Id*.)  According to respondent, the court did not find the evidence admissible and held that if the prosecutor sought to introduce the evidence at trial the petitioner could object. (Resp. Br. at 2.) However, according to respondent, petitioner never objected to the admission of the evidence at trial. (*Id*.)

##### b.    The Trial and Sentencing

On March 20, 2001, petitioner was indicted on two counts of murder in the second degree, one in violation of Penal Law § 125.25(1) and one in violation of Penal Law § 125.25(2). On March 19, 2002, the jury found petitioner guilty of murder in the second degree on the first count of the indictment. (Tr. 1907.) During the sentencing, the court concluded that petitioner attempted to avoid the economic impact of his divorce by killing his spouse. (S.[9] at 6.) Petitioner was sentenced on June 26, 2002 to an indeterminate term of imprisonment of twenty-five years to life and restitution in the sum of six thousand dollars, by civil judgment. (*Id*. at 7.)

##### c.    The Direct Appeal

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division Second Department ("Appellate Division"), on the following grounds: (1) the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt; and (2) the trial court erred by permitting the prosecution to introduce evidence of petitioner's prior bad acts. (Def.-Appellant Br. at 29, 45.) Petitioner also raised ineffective assistance of counsel and successive prosecution claims in his supplemental *pro se* brief. (Appellant's Suppl. *Pro Se* Br. at 4-6.)

On August 12, 2008, the Appellate Division affirmed the trial court's ruling. *People v. Bessaha*, 54 A.D.3d 381, 381-82, 863 N.Y.S.2d 238 (2008). The court held: (1) the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (2) the admission of prior bad acts was unpreserved for appellate review and, in any event, was without merit; (3) petitioner's claim of ineffective counsel could not be reviewed on direct appeal because it was based in part on matters dehors the record, and to the extent the claim could be reviewed, petitioner received meaningful representation; and (4) petitioner's remaining claim of successive prosecution was without merit. *Id*.

---

[8] "PTR" refers to the transcript of petitioner's pre-trial hearing.

[9] "S." refers to the transcript of petitioner's sentencing.

Petitioner then filed an application with the New York Court of Appeals for leave to appeal the Appellate Division's order. (Pet. Br. at 9.)  His application raised the same claims as those raised before the Appellate Division. *Id.*  The New York Court of Appeals denied petitioner's application for leave to appeal on November 28, 2008. *People v. Bessaha*, 11 N.Y.3d 853, 872 N.Y.S.2d 76 (2008).

### 2. The Instant Petition

Petitioner filed this instant habeas corpus petition together with his *pro se* brief in support of the petition for a writ of habeas corpus on August 5, 2009.  Respondent's memorandum of law in opposition to petitioner's petition for writ of habeas corpus was filed on December 14, 2009. The Court has fully considered the arguments and submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"  *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411).  The Second Circuit added that, while "'some increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### III. DISCUSSION

#### A.      Procedural Bar

#### 1.      Exhaustion

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (quotation marks omitted) (alteration in original)).

However, "it is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard*, 404 U.S. at 275-76. On the contrary, to provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan*, 513 U.S. At 365-66. "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191-92 (citing *Picard*, 404 U.S. at 276; *United States ex rel. Cleveland v. Casscles*, 479 F.2d 15, 19-20 (2d Cir. 1973)). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id*. at 192 (footnote omitted).

#### 2.      State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal

constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (additional citations and emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 263 n.9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). Therefore, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Keane*, 118 F.3d at 139 (quoting *Hoke*, 933 F.2d at 120).

However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman*, 501 U.S. at 744-51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Netherland*, 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect that state judgments must be accorded. *See House v. Bell*, 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). Petitioner's federal claims may also be procedurally barred from habeas corpus review if they were decided at the state level on adequate and independent procedural grounds. *See Coleman*, 501 U.S. at 729-33. The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Id*. at 730-31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id*. at 750 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### 3. Application

"The burden of providing exhaustion lies with the habeas petitioner." *Cartagena v. Corcoran*, No. 04-CV-4329 (JS), 2009 WL 1406914, at *3 (E.D.N.Y May 19, 2002) (citing *Colon v. Johnson*, 19 F. Supp. 2d 112, 120 (S.D.N.Y. 1998)). The Court concludes that petitioner has not met that burden with respect to three of his claims.

As discussed *supra*, petitioner raised the following four grounds on direct appeal to the Appellate Division:  (1) the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt; (2) the trial court erred by permitting the prosecution to introduce evidence of petitioner's prior bad acts; (3) ineffective assistance of counsel; and (4) successive prosecution.  Accordingly, petitioner's remaining three claims were not raised on direct appeal.  Those claims are: (1) prosecutorial misconduct; (2) judicial misconduct; and (3) selective prosecution.  Thus, the three claims that were not raised on direct appeal were not properly exhausted, and therefore, are not reviewable by this Court.

Although petitioner exhausted his claims that, (1) the prosecution improperly introduced evidence of his prior bad acts, and (2) his counsel was ineffective, those claims are also procedurally barred from review.[10]

First, the Appellate Division ruled that "defendant's contention regarding the admission of prior bad acts is unpreserved for appellate review and, in any event, is without merit."  *People v. Bessaha*, 54 A.D.3d 381, 863 N.Y.S.2d 238, 238 (App. Div. 2008).  Thus, in disposing of petitioner's claim regarding prior bad acts evidence, the Appellate Division provided a plain statement that this claim was unpreserved for appellate review under established New York law.  Therefore, this claim cannot be reviewed because it was decided on an adequate and independent state procedural ground. *See Coleman*, 501 U.S. at 729-31.  When a state court relies on an independent and adequate state law ground – such as, in this case, failure to preserve the issue for appeal – federal habeas review is foreclosed. *Glenn v. Barlett*, 98 F.3d 721, 724 (2d Cir. 1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review).  This is true even if the state court rules in the alternative on the merits of petitioner's claims. *See id.* at 724-25; *see also Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) ("[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.").  Accordingly, the prior bad acts claim is procedurally barred.

In addition, the Appellate Division ruled that the petitioner's ineffective assistance of counsel claim was not properly before the Appellate Division because it

---

[10] Respondent argues that petitioner's claim that the prosecution failed to prove his guilt beyond a reasonable doubt is procedurally barred. (Resp. Br. at 12.) As respondent states, "A claim concerning the weight of the evidence does not meet this prerequisite, for it is clearly a state law claim . . . Accordingly, this Court – unlike the Appellate Division which was 'satisfied that the verdict of guilt was not against the weight of the evidence,' . . . – is precluded from considering the claim." (*Id.* at 12-13 (internal citations omitted).) However, on direct appeal, petitioner's counsel argued that the prosecution failed to prove petitioner's guilt beyond a reasonable doubt because the evidence presented was both insufficient to support a finding of conviction by the jury . . . and against the weight of the evidence which was presented . . . ." (Def. Appellant Br. at 29 (internal citations omitted).)  Thus, because petitioner exhausted his sufficiency of the evidence claim, that claim is not procedurally barred.  However, as will be discussed *infra*, to the extent petitioner raises a weight of the evidence claim, that is a purely state law claim that cannot be reviewed by this Court. Moreover, Point V of Respondent's brief states that

"Petitioner's Successive Prosecution Claim is Procedurally Barred and Meritless." (*Id.* at 25.) However, Respondent fails to set forth any argument that petitioner's successive prosecution claim is procedurally barred and only addresses the merits of petitioner's claim. (*Id.* at 25-27.) Accordingly, the Court will only address the merits of petitioner's successive prosecution claim.

relied on matters dehors the record, but to the extent that the claim was reviewable, it was without merit. *Bessaha*, 54 A.D. at 382 (citations omitted).  Respondent now argues that because petitioner can raise his outside-the-record arguments in a motion to vacate judgment pursuant to New York Criminal Procedure Law Section 440.10(1)(h), the petitioner's ineffective assistance of counsel claims have not met the exhaustion requirement. (Resp. Br. at 19.) This Court agrees that petitioner's ineffective assistance of counsel claim is therefore unexhausted. Thus, it is not properly reviewable by this Court.[11]

In order for a petitioner to overcome a procedural bar, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. However, petitioner has failed to meet his burden. Petitioner has not provided any explanation for his failure to properly exhaust his claims for prosecutorial misconduct, judicial misconduct, and selective prosecution. Moreover, petitioner has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. Accordingly, as discussed *supra*, these claims are not reviewable by this Court. However, assuming *arguendo* that these

claims were properly before this Court, as discussed *infra*, these claims are clearly without merit.

### B.     Merits

For the reasons set forth below, the Court finds petitioner's grounds for habeas review fail on the merits and concludes that there is no basis for habeas relief.

### 1. Sufficiency of the Evidence Claim

Petitioner contends that the evidence presented at trial was legally insufficient to prove his guilt beyond a reasonable doubt. (Pet. Br. at 6, 32.)[12]  However, as set forth below, the Court finds that petitioner is not entitled to habeas relief on this ground.

### a.     Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established.   A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the

---

[11] Generally, when a defendant raises both exhausted and unexhausted claims, a stay of habeas proceedings is appropriate only if there is good cause for the defendant's failure to exhaust his claims in state court and when the unexhausted claims are not "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005).  As will be discussed *infra*, petitioner's claim of ineffective assistance of counsel is "plainly meritless," as are all of his claims.   Thus, it is appropriate for the Court to deny petitioner habeas relief although his claim is unexhausted.

[12] Respondent argues that a claim concerning the weight of evidence is a state law claim and not the basis for habeas review.   (*See* Resp. Br. at 12.) Although petitioner does not specifically raise this claim in his petition, to the extent that one exists, this Court agrees with respondent that the claim must fail. A "weight of the evidence" claim is based on state law.  *See Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.").   The Court cannot consider a purely state law claim on federal habeas review.  *See Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . ").   Therefore, to the extent petitioner raises a claim that his conviction was against the weight of evidence, the Court cannot review it.   However, even construed as a sufficiency claim, it is without merit, as discussed *infra*.

evidence in an application for a writ of habeas corpus. *Einaugler v. Sup. Ct. of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial"). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

A habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

b.    Application

Petitioner argues that the prosecution failed to prove his guilt beyond a reasonable doubt. However, upon review of the record, it is clear that the prosecution presented sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that petitioner was guilty.

First, the jurors heard testimony regarding petitioner's motive, including: (1) Wisel's testimony that petitioner told Ourida "I have $900,000 and you will never see any of it"; (2) Alex's testimony that petitioner was only willing to give Ourida $50,000; (3) testimony regarding petitioner's unwillingness to follow court orders and pay maintenance which resulted in the appointment of a receiver and subsequently the arrangement to sign contracts in court on February 1, 1999 for the sale of the properties; (4) Alex's testimony that petitioner told Alex "you know what she needs, what she needs is a bullet to her head" and then subsequently stating that he was "not afraid of jail," and (5) Alex's testimony that he informed petitioner that his mother was unwilling to settle for less. Moreover, the jurors heard testimony regarding the footwear impression, hair

strand and key.  In particular, the jurors heard testimony: (1) from Dr. Kovar that the darkened spot on the footwear impression found in the victim's blood corresponded "perfectly with the gum and rock-like material" that was embedded in the shoe recovered from petitioner's closet, (2) from Schiraldi that testified that "the root portion [of the hair strand found at the murder scene]" was very similar to petitioner's and it could have come from petitioner, and (3) that there was no sign of forced entry into the home and petitioner's blue duffle bag had a key that opened the lock on the back door leading from the laundry room into the garage.  Accordingly, there was extremely strong evidence in the record for a rational trier of fact to conclude that petitioner was guilty beyond a reasonable doubt.

It should also be noted that, although the testimony of Dr. Saferstein and Smith tended to support petitioner's argument at trial, the conclusion of the Court is not altered.  Dr. Saferstein agreed that it was possible for the sole of the shoe to have worn off between the date of the murder and the date the shoe was recovered and that to properly examine the imprint it would have to be raised with amidol black, which Dr. Saferstein had never used.  Moreover, Smith did not conduct a DNA analysis of the hair strand and acknowledged that a DNA analysis was required to make a determination as to the hair strand. Although petitioner also introduced evidence at trial of an alibi, as discussed in detail *supra*, that evidence had several inconsistencies.  Accordingly, a reasonable jury could credit the testimony of the prosecution's witnesses as opposed to the petitioner's witnesses.

Thus, a rational trier of fact could have concluded that petitioner was guilty beyond a reasonable doubt.  Accordingly, petitioner

cannot be granted habeas relief on this ground.

### 2.    The Evidentiary Ruling

Petitioner claims that he was denied a fair trial when the trial court permitted the prosecution to introduce evidence of petitioner's prior bad acts.[13]  Specifically, petitioner argues in his brief that his "prosecution for mail fraud, money laundering and passport fraud, arising out of the state divorce proceeding, is a pretext prosecution commenced solely for the purpose of detaining the defendant" and "the government commenced the prosecution . . . due to the fact that [the] state lacks probable cause to arrest defendant for the murder of his wife."  (Pet. Br. at 15.)  As discussed *supra*, this claim is procedurally barred.  However, in an abundance of caution, the court has reviewed the merits of petitioner's claim and finds that it does not provide a basis for habeas relief.

### a.    Legal Standard

A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

---

[13] According to the petition, petitioner was arrested on March 3, 1999, and was charged with the federal crime of money laundering, wire fraud, and passport violation.  He was denied bail because of risk of flight.  In June, petitioner appeared before Judge Wexler in the Eastern District Court. The jury was selected.  However, during summation, the government read an article containing information about petitioner being a suspect in a murder case. As a result, a mistrial was declared and a new trial was ordered. The case was moved to the Southern District Court. However, because the trial occurred during the 9/11 attacks, a second mistrial was pronounced. (Pet. Br. at 8-10.) Petitioner contends that the trial court erred in permitting the prosecution to introduce this evidence because it was "obtained by U.S. Federal agents for unrelated federal proceeding for which the defendant was tried twice in federal court." (*Id.* at 42.)

States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983); s*ee generally Estelle*, 502 U.S. 62, 67 (1991) ("Habeas corpus relief does not lie for errors of state law." (citations omitted)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must demonstrate that the error deprived him of his right to "a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F. 3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (*quoting Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted))).

In determining whether a state court's alleged evidentiary error deprived petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello*, 333 F.3d 51, 59-60 & n.7 (2d Cir. 2003); *Ramos v. Phillips*, No. 104-CV-1472-ENV. 2006 WL 3681150, at *6 (E.D.N.Y. Dec 12, 2006).

### b.    Application

Under New York law, "[a] trial court may admit into evidence uncharged crimes when the evidence is relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged." *People v. Till*, 87 N.Y.2d 835, 836, 661 N.E.2d 153, 154 (1995). However,

"[e]ven then, such evidence is admissible only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant." *Id*. (citations omitted). In *People v. Molineux*, 61 N.E. 286 (N.Y. 1901), the New York Court of Appeals stated that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. *Id*. at 294. However, this list is "illustrative and not exhaustive," *People v. Rojas*, 97 N.Y.2d 32, 37, 760 N.E.2d 1265, 1268 (2001), and evidence of uncharged crimes that is necessary to provide "background material" or to "complete the narrative of the episode" may also be admissible. *Till*, 661 N.E.2d at 154 (internal citations omitted).

In the instant case, the evidence of petitioner's prior bad acts was properly admitted under New York law to provide background to the jury to understand the nature of the relationship between petitioner and Ourida since the victim in this case was his wife. The evidence of petitioner's prior bad acts committed during their divorce action clarified the events that led up to the killing and explained plaintiff's motive for the crime. Accordingly, the trial court did not err in admitting such evidence.

Moreover, even assuming the state trial court erred in admitting the evidence, any error did not deprive petitioner of his right to a fair trial. "Due process requires the state courts in conducting criminal trials to proceed consistently with 'that fundamental fairness' which is 'essential to the very

concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) *abrogated on other grounds by Perry v. New Hampshire*, 123 U.S. 716 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Where, as here, the evidence does not relate to an essential element of the charged crimes, its admission will violate due process only when it is "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Id.* (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (explaining that the evidence must be "crucial, critical, highly significant" (internal quotation marks omitted)). Moreover, even if a constitutional error occurred, it "will merit habeas corpus relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Sierra v. Burge*, No. 06 Civ. 14432 (DC), 2007 WL 4218926, at *6 (S.D.N.Y. Nov. 30, 2007) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). Further, in assessing materiality, the Court must view the evidence "objectively in light of the entire record before the jury." *Collins*, 755 F.2d at 19.

Here, even if the trial court erroneously admitted the evidence of petitioner's prior bad acts, the prior bad acts evidence was not "sufficiently material to provide the basis for [petitioner's] conviction" nor did the prior bad acts evidence "remove a reasonable doubt that would have existed . . . without it." *Dunnigan*, 137 F.3d at 125 (quotations and citations omitted). Instead, the jury had

extremely strong evidence – beyond the prior bad acts evidence – to conclude that petitioner murdered Ourida Bessaha on January 31, 1999. The evidence was extremely strong in this case based upon, among other things, the evidence discussed *supra* in connection with the sufficiency of evidence claim. In light of the entire record, there is nothing about the admission of this evidence, even if it were erroneous, that rendered petitioner's trial unfair.

In sum, the state court's ruling allowing the evidence as to prior bad acts was not contrary to, or an unreasonable application of, clearly established federal law. Thus, petitioner's request for a writ of habeas corpus based upon the state court's evidentiary ruling is denied.

### 3.    Prosecutorial Misconduct Claim

Petitioner asserts that the cumulative effect of the prosecutor's misconduct during summation denied him of a fair trial. (pet. Br. at 48.) Specifically, petitioner claims that the prosecutor made improper summation comments regarding his personal belief in petitioner's guilt, mischaracterized witness testimony, cited to facts not in evidence, and was aware of witness tampering with a defense witness. (*Id.*) As discussed *supra*, this claim is not exhausted. However, even if it was properly before the Court, it is without merit.

#### a.    Legal Standard

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due

process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). For a claim of prosecutorial misconduct to suffice to establish a claim of constitutional error, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks omitted). "There must instead, be a showing that '[petitioner] suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Alexander v. Phillips*, 02 Civ. 8735 (SAS)(FM), 2006 U.S. Dist. LEXIS 8926, at *40-41 (S.D.N.Y. Feb. 21, 2006) (quoting *Bentley v. Scully*, 41 F .3d 818, 824 (2d Cir. 1994)); *see also Dawkins v. Artuz*, 152 F. App'x 45, 46-47 (2d Cir. 2005) ("To warrant granting the writ, the prosecutorial misconduct must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Darden*, 477 U.S. at 181)). "[N]ot every trial error or infirmity which might call for the application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). The Court must then review such comments by a prosecutor narrowly to determine whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

To overcome this burden, petitioner must show that he "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Factors considered in determining such prejudice include "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prosecutorial conduct." *Id.*; *accord United States v. Thomas*, 311 F.3d 232, 245 (2d Cir. 2004); *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990). "In addition, in determining whether a prosecutor's conduct was unconstitutional, a court 'must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's [remarks]. . . . if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.'" *Everett v. Fischer*, No. 00 Civ. 6300, 2002 WL 1447487, at *2 (E.D.N.Y. July 3, 2002) (quoting *Young*, 470 U.S. at 13, 14) (alterations in original). Moreover, "[w]hen analyzing the severity of alleged misconduct, the court examines the prosecutor's statements in the context of the entire trial." *Miller v. Barkley*, No. 03 Civ. 8580 (DLC) (citing *United States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004)).

b.    Application

The petition does not state which specific statements made by the prosecutor were improper. The petitioner generally alleges that the basis for his belief that there was prosecutorial misconduct during summation because the prosecutor cited facts not in evidence, expressed his personal beliefs regarding petitioner's guilt, mischaracterized defense witnesses, and was aware of witness tampering. (Pet. Br. at 48.)

Although the petitioner has failed to point to specific statements in the record to support his position, the respondent addresses the portion of the summation where the prosecutor characterizes Dr. Saferstein and Smith as "frauds." (Res. Br. at 22 (citing Tr. 1801-05).) The respondent argues that these statements played a *de minimis* role in the summation and pointed out the weaknesses in the experts' testimony. The Court agrees with respondent that even assuming arguendo that the prosecution's comments were improper, (which petitioner has failed to demonstrate) they would not warrant habeas relief on the facts of this case.

First, after reviewing the record in its entirety, this Court concludes that the prosecutor's remarks during summation, including those made about plaintiff's experts, were not sufficiently severe to warrant habeas relief when considered in light of other facts. *See, e.g.*, *Martin v. Brown*, No. 08-CV-0316 (JFB), 2010 WL 1740432, at *15 (E.D.N.Y. Apr. 29, 2010) ("In any event, even assuming *arguendo* that these or other comments by the prosecutor were improper, they were not severe or egregious and certainly did not render the trial so unfair as to deprive petitioner of his due process rights. Within the lengthy summation that involved an analysis of the trial evidence, the challenged comments did not play a substantial role in the summation, much less the entirety of the trial. . . . Moreover, given the evidence of petitioner's guilt, as discussed *supra*, even if the comments were improper, they would not warrant habeas relief because they clearly did not have a substantial or injurious effect or influence on the jury's verdict.").

As the Second Circuit noted, "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives in summation." *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995); *see, Mastowski v. Superintendent*, No-CV-0445T, 2011 WL 4955029, at *12-13 (W.D.N.Y. Oct. 18, 2011) (prosecution's statements that petitioner's expert witness was a "crook" "were not improper and, even if they were, were not so egregious as to have deprived petitioner of a fair trial); *see also Coble v. Quarterman*, 496 F.3d 430, 438 (5th Cir. 2007) (rejecting claim on habeas that trial counsel was ineffective for failing to object to prosecutor's comments during closing arguments describing petitioner as "a cold-blooded, merciless, remorseless killer"); *United States v. Pirro*, 9 F. App'x 45, 51 (2d Cir. 2001) ("[T]he prosecutor's argument to the jury that 'justice demands' a conviction was perfectly legitimate."); *United States v. Pungitore*, 910 F.2d 1084, 1127 (3d Cir. 1990) (concluding that prosecutor's reference to defendant as a "cold-blooded murderer" and other defendants as "mob killers" were fair comments on the evidence adduced at trial); *United States v. Taxe*, 540 F.2d 961, 967-68 (9th Cir. 1976) (concluding that prosecutor's characterizations of defendant as a "scavenger," "parasite," "fraud," and "professional con-man," was supported by the evidence and not prejudicial). The comments here were isolated and brief, and not a basis for habeas relief.

In any event, the trial court minimized any prejudice to petitioner in its instructions to the jury. Before summations began, the court instructed the jury that: (1) "[t]he openings, the summations, arguments, and the remarks of counsel, [are] not evidence and they may not be considered by you as evidence in this case. If the attorneys, during the course of their summations or I in this charge should allude to the facts and your recollection of those facts disagrees with the attorneys or my recital of them, disregard

what we have to say." (Tr. at 1862.); and (2) "It is your own recollection, understanding and evaluation of the facts that govern. Remember, you're the sole judges of what the facts are and of which facts you will accept in arriving at your verdict." (*Id*. at 1862.) Accordingly, the Court finds the measures taken by the state trial court were sufficient to eliminate any potential prejudice from the prosecutor's statements.

With respect to petitioner's argument that the prosecution cited to facts not in evidence, the trial judge's jury instructions similarly minimized any prejudice. The trial judge stated to the jury; "it's essential that you base your verdict upon the evidence and the evidence alone as you heard it from the mouths of the witnesses and from the various exhibits that were admitted into evidence. You are not to consider anything outside of the evidence." (*Id*. at 1861.) Thus, the trial judge made it clear that the jury was to follow the law and facts as he instructed them and not what the prosecution may have suggested in summation.

Finally, petitioner has failed to show that his conviction was uncertain absent the challenged prosecutorial conduct. As the Second Circuit has noted, "[o]ften, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981); *see also Bentley*, 41 F.3d at 824-25 (holding that review of a habeas corpus challenge based upon prosecutorial misconduct includes consideration of "whether the conviction was certain absent the prejudicial conduct[,]" finding harmless error and a failure to demonstrate a substantial or

injurious effect where there was "compelling evidence in the prosecution's case . . . [and] the prosecutor's summation comments were both brief and isolated."); *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) ("The clear evidence of guilt demonstrates that [petitioner] was not prejudiced by the prosecutor's improper remarks.").

In the instant case, as discussed *supra*, extremely strong evidence was presented at trial for a jury to conclude beyond a reasonable doubt that petitioner was guilty of murder in the second degree. Moreover, even if the comments were improper, they would not warrant habeas relief because they clearly did not have a substantial or injurious effect or influence on the jury's verdict. *See*, *e.g*., *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (finding the prosecutor's comments, including that victim was virtuous and that the community cried out for "safer streets," while improper, did not render trial fundamentally unfair in light of the court's instructions and the strength of the prosecution's case); *Gilchrist v. Hagan*, C/A No. 6:06-1236-MBS, 2007 WL 951749, at *27 (D.S.C. Mar. 27, 2007) (Report & Recommendation adopted by District Court) ("[T]he prosecutor's comments that the petitioner had just killed 'a defenseless man, and he had to come up with some alternative version of reality,' as well as the reference to the petitioner having 'nine hours between cold-bloodedly killing this man here and turning himself in . . . to create the fiction you all heard from him yesterday,' . . . were merely an appropriate argument that the petitioner was guilty of murder and his testimony . . ., as well as that of his other witnesses, was not credible" (citations omitted)); *see also United States v. Wiley*, 29 F.3d 345, 351 (8th Cir. 1994) ("We conclude that the prosecutor's characterization of [the defendant] as a

'criminal' and 'drug dealer,' although arguably improper, did not deprive [the defendant] of a fair trial." (collecting cases)); *Corbett v. Mintzes*, No. 84-1021, 1985 WL 13562, at *2 (6th Cir. 1985) ("The statements that [petitioner] was a mean, vindictive, col[d]- blooded person and that he was looking for an excuse to attack [the victim] while possibly improper were not so egregious to constitute a deprivation of [petitioner's] right to due process. We therefore find that the comments do not warrant habeas relief."); *Lizardi v. Ercole*, No. 06 CV 2848(JG), 2007 WL 534528, at *2, 5 (E.D.N.Y. Feb. 15, 2007) (holding that prosecutor's comments, including that victims were subjected to "unspeakable terror" did not rise to the level of a due process violation); *Williams v. Donnelly*, Nos. 00-CV4445 (DGT), 00-CV-4447 (DGT), 00-CV4448 (DGT), 2005 WL 2290592, at *12-13 (E.D.N.Y. Apr. 12, 2005) (holding that prosecutor's comment that victim was a "hard working man, who was trying to live the American dream," even if improper, did not warrant habeas relief); *Toro v. Herbert*, Nos. 01-CV-3386 (JBW), 03-MISC-0066 (JBW), 2003 WL 22992059, at *6 (E.D.N.Y. Sept. 29, 2003) (where prosecutor, among other things, referred to defendant as a cold-blooded murderer during summation, "none of the prosecutor's remarks was sufficiently egregious – whether in isolation or when accumulated – to have denied petitioner a fair trial").

Moreover, with regards to petitioner's claim that the prosecution cited to facts that were not in evidence, the Court finds this argument to be without merit. Petitioner has failed to specify which statements made by the prosecution, in his summation or otherwise, were based on facts not in evidence. The Court has reviewed the record, and in particular the summation, and

does not find any basis for the petitioner's claim that the prosecution relied on evidence outside the record.

In sum, in light of all the factors – including the evidence of guilt at trial, the brief and isolated nature of the alleged objectionable comments, and the court's instructions to the jury, the Court finds that the prosecutor's summation statements did not cause the petitioner to suffer any actual prejudice that would have had an injurious effect or influence on the jury's verdict. Accordingly, there is no basis for habeas relief on this prosecutorial misconduct claim.[14]

4.    Judicial Misconduct Claim

Petitioner argues that he was deprived of a fair trial: (1) when the judge "was bias, held trial with interest in the case and sided with the prosecution"; and (2) when the

---

[14] With regard to petitioner's claim of witness tampering, petitioner still has the remedy of a motion to vacate pursuant to New York Criminal Procedure Law § 440.10(1)(h) available to him. As stated *supra*, when a defendant raises both exhausted and unexhausted claims, a stay of habeas proceedings is appropriate only if there is good cause for the defendant's failure to exhaust his claims in state court and when the unexhausted claims are not "plainly meritless." *Rhines*, 544 U.S. at 277-78. Here, petitioner does not name the witness he alleges was tampered with and has failed to articulate how he was prejudiced with respect to any such tampering. Thus, although petitioner's allegation of witness tampering is unexhausted, it is patently frivolous and cannot be the basis for habeas relief. *See Goines v. Walker*, 54 F. Supp. 2d 153, 155-156 (E.D.N.Y. 1999) (citations omitted) ("[T]he district court should deny unexhausted claims which are patently frivolous so that they do not fester in either the state or federal judicial system."); *see also Ramos v. Keane*, No. 98-CV-1640, 2000 WL 12142, at *5 (S.D.N.Y. Jan. 6, 2000) ("Courts addressing the issue have generally held that an unexhausted claim should only be dismissed on the merits if it is 'patently frivolous' or if it is 'perfectly clear' that it 'does not raise even a colorable federal claim.'" (citations omitted)).

judge "gave defective reasonable doubt instruction to the [j]ury and an unreasonable determination of facts in light of the evidence presented in the county court proceeding."[15] (Pet Br. at 49.) All of these claims fail on the merits as discussed *infra*.

### a. Judicial Bias Claim

Petitioner claims Judge Joseph C. Calabrese was biased in his treatment of defense counsel, and as a result, deprived him of his fundamental right to a fair trial. Petitioner alleges that the court created bias against the defense when it allegedly allowed the prosecutor to misrepresent facts not in evidence and when it overruled the defense when objecting to the prosecution. (Pet. Br. at 49.) However, petitioner does not cite to any specific statement that indicates the judge was biased. As set forth below, the Court finds this claim to be clearly without merit.

To establish that a judge has engaged in misconduct sufficient to warrant habeas relief, petitioner must show that the judge demonstrated "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Litkey v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see also Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (in order to succeed on a

judicial misconduct claim, a party must "overcome a presumption of honesty and integrity in those serving as adjudicators"). In reviewing a judicial misconduct claim, courts are to presume that public officials have properly discharged their official duties. *See Bracey v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Furthermore, a habeas petitioner must demonstrate that the trial judge engaged in conduct so "fundamentally unfair" that it violated the due process requirements of the United States Constitution. *See Daye v. Attorney General*, 712 F.2d 1566, 1570-1 (2d Cir. 1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984); *Salahuddin v. Strack*, No. 97-CV-5789, 1998 WL 812648, at *8 (E.D.N.Y. Aug. 12, 1998). Without this violation, "undesirable" conduct on the part of the judge is not enough. *See Daye*, 712 F.2d at 1572. Proving judicial misconduct is no simple task. *See Buckelew v. United States*, 575 F.2d 515, 518 (5th Cir. 1978) (there was no due process violation where the judge was physically ill during part of the trial, and fell asleep "[s]ince we are told no specific error resulting from the trial judge's alleged physical condition, a due process violation has not been made out. It is not error to be ill.").

Under federal habeas review, a petitioner faces a high hurdle in demonstrating he was constitutionally deprived of a fair trial because of biased treatment by a state trial judge. Although "prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause," *Daye*, 712 F.2d at 1570, "a federal [habeas] court will not lightly intervene when such a claim is asserted." *Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir. 1985). The "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and

---

[15] To the extent petitioner also asserts in his brief that the judge applied New York Criminal Procedure Law § 470.05(2) incorrectly, (Pet. Br. at 6, 49), this Court disagrees. New York Criminal Procedure Law § 470.05(2) proscribes general principles which apply to appellate courts for review of appeals and therefore this claim is without basis. Moreover, petitioner also argues that the Judge was biased because he "applied standards incorrectly to permit the prosecution to introduce evidence which was tried in other Courts." (*Id.* at 49.) However, as discussed *supra*, the court properly permitted the prosecution to introduce evidence of petitioner's prior bad acts at trial.

be adverse to the defendant to a substantial degree before the risk of either [1] impaired functioning of the jury or [2] lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Daye*, 712 F.2d at 1572.  In determining either, both the quantity and significance of the statements ought to be weighed.  *Id.* (referring to the "quantity and nature of the trial judge's questioning").

The Second Circuit has acknowledged that the standard for determining when exactly a state judge engages in impermissible intervention is "'somewhat ill-defined.'"  *Gayle*, 779 F.2d at 806 (quoting *Johnson v. Scully*, 727 F.2d 222, 226 (2d Cir.1984)).  However, case law regarding review of judicial intervention claims in federal criminal trials provides useful guidance here.  In reviewing a federal judge's conduct, the Second Circuit has made clear that the judge's behavior must be "so prejudicial that it denied [petitioner] a fair, as distinguished from a perfect, trial." *United States v. Robinson*, 635 F.2d 981, 984 (2d Cir. 1980), *cert. denied*, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). The issue is not one of "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985). "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether 'it appeared clear to the jury that the court believed the accused is guilty.'" *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir.1996) (quoting *United States v. Nazzaro*, 472 F.2d 302, 303 (2d Cir. 1973)).

In the instant case, petitioner has failed to demonstrate that the trial judge engaged in any conduct that was "fundamentally unfair." In looking at the record, there is absolutely no evidence that the trial judge conveyed a partiality to the jury that would have factored into its determination of petitioner's guilt, nor did the trial judge express a bias that undermined the appearance of a fair trial. In short, there is simply no evidence of judicial bias. In addition, there was extremely strong proof of defendant's guilt. Thus, had any of the trial judge's conduct amounted to constitutional error, the violation would be subject to harmless error review. Based on the evidence of petitioner's guilt, the jury would have found petitioner guilty regardless of any improper judicial bias. Accordingly, petitioner's claim that the trial judge was biased does not provide a basis for habeas relief under the circumstances.

b.    Defective Reasonable Doubt
Instruction Claim

Petitioner argues that he is entitled to habeas relief because the state trial judge gave erroneous jury instructions. Specifically, petitioner contends the "Judge gave a defective reasonable doubt instruction to the Jury. And 'unreasonable determination of facts in light of the evidence presented in the county court proceeding.'" (Pet. Br. at 49.)

Jury instructions violate due process if they "fail[ ] to give effect to [the] requirement" that the prosecution must prove every element of a charged offense beyond a reasonable doubt." *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam). However, "a state prisoner making a claim of improper jury instructions faces a substantial burden." *Delvalle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002). The petitioner must establish that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violat[ed]

due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'" *Id*. at 1201 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *see also Middleton*, 541 U.S. at 437 (explaining that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation").

In this case, the Court finds that the trial court's instruction on reasonable doubt was not erroneous and certainly did not constitute a due process violation. First, the Court notes that, contrary to petitioner's contentions, the trial court did not engage in an unreasonable determination of the facts in light of evidence. As discussed *supra*, the trial judge instructed the jury "you're the sole judges of what the facts are and of which facts you will accept in arriving at your verdict." (Tr. at 1862.) The trial judge further instructed:

> [i]f after considering all the evidence you have a reasonable doubt in your mind that Ali Bessaha is the person who committed the crime, you must find him not guilty. However, if after considering all the evidence you find the People have proven beyond a reasonable doubt all the essential elements of the crime and that Ali Bessaha is the person who committed the crime, then you must find him guilty.

(*Id*. at 1880.) In sum, the trial court's jury instructions clearly instructed the jury that petitioner's guilt needed to be established beyond a reasonable doubt. Therefore, the Court finds that petitioner's claim regarding the trial court's jury instructions does not provide a basis for habeas relief under the circumstances of this case.

### 5.   Selective Prosecution Claim

Petitioner alleges he was prosecuted for the federal crime of money laundering, mail fraud, and passport fraud as "a pretext prosecution commenced solely for the purpose of detaining [petitioner]." (Pet. Br. at 15.)   Petitioner contends that the pretextual context of the indictment is evidenced by the search warrant, "which does not seek evidence of mail fraud . . . but seeks footwear, clothing leaving traces of blood and/or excrement and tools including hammers, all of which would be evidence relevant to a state murder charge and not [f]ederal mail fraud charge." (*Id*. at 20.) Respondent argues that petitioner has not suffered any resulting prejudice as the federal charges were dropped after two mistrials. (Resp. Br. at 32.) Moreover, respondent argues that petitioner should have raised this claim in the federal court that oversaw his prosecution.  (*Id*.)

As set forth below, the Court finds petitioner's selective prosecution claim to be without merit.

### a.   Legal Standard

To support a claim of selective prosecution, petitioner bears the "heavy burden" of establishing "intentional and purposeful discrimination." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974); *See also United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Lombard v. Mazzuca*, 00 CV 74622 (JG), 2003 WL 22900918, at *4 (E.D.N.Y. Dec. 8, 2003).  Petitioner must establish a prima facie case:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the

basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Berrios*, 501 F.2d at, 121 (citing *Snowden v. Hughe*s, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1943); *Moss v. Hornig*, 314 F.2d 89, 92-93 (2d Cir. 1963); *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (en banc); *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972); *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972). "[C]onscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). "A selective prosecution claim is not a defense on the merits to a criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Sanders*, 17 F. Supp. 2d 141, 144 (E.D.N.Y. 1998) (citing *United States v. Armstrong*, 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996)).

The Second Circuit has stated that, "the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (citing *United States v. White*, 972 F.2d 16, 18 (2d Cir. 1992)); *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (explaining "the decision to prosecute is particularly ill-suited to judicial review"); *Armstrong*, 517 U.S. at 464 ("The presumption of regularity supports their

prosecutorial decisions and, in absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926) (internal quotation marks omitted)). As a result, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).

"Of course, this judicial discretion cannot be exercised in extra-legal fashion, and it is properly 'subject to constitutional constraints.'" *United States v. Alameh*, 341 F.3d at 173 (quoting *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

b.    Application

Petitioner claims he was selectively prosecuted because: (1) "he was singled out for prosecution regarding the alleged transfer of assets during the divorce proceeding while others similarly situated have not been generally prosecuted for the same conduct"; (2) "there was no allegation of mail fraud until the murder of Mrs. Bessaha"; and (3) "[because] the allegation of transfer of assets within a divorce situation is a prime example of a case involving isolated transactions between individuals in which the parties should be left to settle their differences by civil or criminal litigation." (Pet. Br. at 19-20.)

It is unclear whether petitioner is arguing that the State selectively prosecuted him for murder or that the federal government

24

selectively prosecuted him for mail fraud, money laundering and passport fraud. To the extent petitioner is arguing that he was selectively prosecuted for murder, this claim fails because there is nothing in the record to support this claim. Petitioner has only speculated that he was selectively prosecuted. Thus, this claim is clearly without merit

Moreover, to the extent petitioner is arguing that the federal government selectively prosecuted him for mail fraud, money laundering and passport fraud, that claim is also without merit. First, petitioner has failed to provide any evidence that the decision to prosecute him was made in bad faith or for an impermissible reason. Moreover, any claim that petitioner was selectively prosecuted for mail fraud, money laundering and passport fraud should have been raised before the federal trial court that presided over his federal prosecutions. In addition, plaintiff has suffered no prejudice because these federal charges were dropped after two mistrials. Thus, petitioner's selective prosecution claim is clearly without merit.

6.      Successive Prosecution Claim

Petitioner argues his rights under the Double Jeopardy Clause of the Fifth Amendment were violated because the exception to the doctrine of dual sovereignty applies, which bars successive prosecutions "where one sovereign can be said to be acting as a 'tool' of the other." (Pet. Br. at 13; citing *United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990).) In response, respondent argues double jeopardy does not apply because "the sovereignty exception permits successive prosecution for state and federal charges for the same crime." (Resp. Br. at 25; citing *People v. Abbamonte*, 43 N.Y.2d 74, 81, 371 N.E.2d 485 (1977).)

Respondent further argues that "under New York law, where the two offenses are not based upon the same act or criminal transaction, there is no bar to the second prosecution." (Resp. Br. at 25; citing *Polito v. Walsh*, 8 N.Y.3d 683, 871 N.E.2d 537 (2007).) The Court concludes that petitioner's successive prosecution claim fails on the merits.

a.      Legal Standard

The Double Jeopardy Clause provides that no "person shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. "'[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)). The purpose of the Clause is to prevent the government from "'mak[ing] repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent, he may be found guilty.'" *United States v. Podde*, 105 F.3d 813, 816 (2d Cir. 1997) (quoting *Green v. United States*, 355 U.S. 184, 187-88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)). The test for determining whether two crimes constitute the same offense was set forth by the Supreme Court in *Blockberg v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), where the Court stated that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each

25

provision requires proof of an additional fact that the other does not."

Nevertheless, "a defendant in a criminal case may be prosecuted by different sovereigns for the same offense" under the doctrine of dual sovereignty. *United States v. Nelson*, 277 F.3d 164, 212 (2d Cir. 2002) (citing *Heath v. Alabama*, 474 U.S. 82, 88-89, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (when "a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences'"); *see also United States v. Lanza*, 260 U.S. 377, 382, 43 S. Ct. 141, 142, 67 L. Ed. 314 (1922) ("Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other. It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.").

A narrow exception to the dual sovereignty doctrine is the "*Bartkus* exception" which provides "[i]f the second prosecution, otherwise permissible under the dual sovereignty rule, is not pursued to vindicate the separate interests of the second sovereign, but is merely pursed as a sham on behalf of the sovereign first to prosecute, it may be subject to a successful double jeopardy challenge." *United States v. Koon*, 34 F.3d 1416, 1438 (9th Cir. 1994) *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81, 116 S.Ct. 2035, 135 L. Ed. 2d 392 (1996) (citing *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L. Ed. 2d 684 (1959)). Under this exception, to establish double jeopardy, a petitioner must show that the subsequent prosecution was merely "a sham and a cover for a federal prosecution." *Bartkus*, 359 U.S. at 678; *see also Koon*, 34 F.3d at 1439 (holding a defendant must

demonstrate "the subsequent prosecuting entity is a 'tool' for the first, or the proceeding is a 'sham,' done at the behest of the prior authority" (quoting *United States v. Figueroa-Soto*, 938 F.2d 1015, 1019 (9th Cir. 1991)). To assert this narrow exception, a petitioner bears the burden of proving that the "state and federal prosecutions are so intertwined as to undermine the assumption that the two supposedly independent criminal actions were prosecuted by separate sovereigns." *United States v. Castro*, 659 F. Supp. 2d 415, 419 (E.D.N.Y. 2009) *aff'd*. 411 F. App'x 415 (2d Cir. 2011) (quoting *United States v. Coonan*, 938 F.2d 1553, 1563 (2d Cir. 1991)).

b.    Application

Petitioner argues the exception to the doctrine of dual sovereignty applies because the state prosecution was used as a "tool of the other" and a "sham and cover for the other." (Pet. Br. at 13.)   Petitioner contends that the federal charges of "money laundering, wire and passport fraud . . . were merely a pretext to cloak the real intention" and that "the evidence seized with federal warrant, should not have been introduced in the state murder case." (*Id*.) Petitioner further alleges the "U.S government initiated this prosecution to insure [his] incarceration because he was a suspect in the murder of his wife" and that "there was no 'probable cause' to arrest [petitioner] on that charge." (*Id*. at 9.)

However, the Second Circuit has rejected the notion that a double jeopardy violation exists where a defendant's allegations "fall short of showing the sort of manipulation that could avoid the general rule." *United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir. 1984) (explaining "there was here no more than a joint investigation of criminal activity, which we

have held does not preclude separate prosecutions"); *United States v. Russotti*, 717 F.2d 27, 30-31 (2d Cir. 1983) (finding cooperation between state and federal authorities does not preclude successive prosecutions nor did it suggest that state murder prosecution was merely a cover for the subsequent federal prosecution by federal authorities who were substantially involved in the state prosecution); *United States v. Ng*, 699 F.2d 63, 69 (2d Cir. 1983) (explaining in "absence of a sound basis for an inference of vindictiveness . . . the federal prosecution of a person for the same acts forming the basis of a previous state conviction does not violate the defendant's constitutional right to protection against double jeopardy.")

In the present case, petitioner has offered no evidence to support his claim that the federal prosecution was a "sham" or "cover" for the state prosecution. The Second Circuit has stated that a defendant must offer "proof of federal orchestration of the state murder trial other than the barest conclusory allegations" to establish a claim under the narrow exception. *Russotti*, 717 F.2d at 31; *See also Koon*, 34 F.3d at 1439 (finding there was no evidence to suggest the federal prosecution was a sham for the state prosecution where "(1) the federal investigation began when the crime occurred and remained active during the state investigation; (2) federal and state authorities cooperated with each other; . . . (3) witnesses who testified in the federal trial were interviewed by the federal authorities soon after the incident; and (4) the . . . videotape was admitted into evidence in the federal trial.") Petitioner points to the fact that the state prosecution introduced evidence gathered by federal agents and admitted into evidence in federal trial to support his claim. (Pet. Br. at 13.) Nevertheless, "the fact that evidence

developed from the state trial was used in the federal trial does not create a double jeopardy problem." *Koon*, 34 F.3d at 1439; *Figueroa-Soto*, 938 F.2d at 1018-19 (finding that evidence gathered by federal authorities presented in state trial did not establish that the state "in bringing its prosecution was merely a tool of the federal authorities" and did not "sustain a conclusion that the state prosecution was a sham and cover for a federal prosecution"); *Bartkus*, 359 U.S. at 678 (explaining federal officials acting in cooperation with state authorities "is the conventional practice between the two sets of prosecutors throughout the country").

In sum, petitioner does not provide any evidence that the federal prosecution was a sham or cover for the state prosecution or vice versa. Petitioner has not met his burden of establishing the subsequent prosecuting entity was a tool for the first. Accordingly, petitioner's murder conviction was not barred by the Double Jeopardy Clause and petitioner's successive prosecution claim does not warrant habeas relief.

7.     Ineffective Assistance of Counsel Claim

Petitioner further contends that he received ineffective assistance of counsel because counsel: (1) failed to petition the court for a change of venue; (2) failed to prepare for trial; (3) refused to communicate with petitioner; (4) engaged in poor trial strategy which led to his conviction; (5) failed to make a motion to suppress the uncharged crime evidence, such as petitioner's prior acts; (6) "failed to object and or preserve prejudicial evidence, such as double jeopardy and other prejudices"; and (7) made "cumulative errors . . . cursory cross-examination, half dozen witness[es] weren't crossed at all." (Pet. Br. at 46.) As discussed *supra*, respondent argues that

petitioner's claims involving counsel's failure to request change of venue, failure to communicate with petitioner, failure to adequately prepare for trial, failure to investigate two prior federal trials, and poor trial strategy are all based on matters that are outside the record, and therefore, are not reviewable by this Court. (Resp. Br. at 18.) In any event, respondent also argues that petitioner was provided with meaningful representation and, thus, his claim fails on the merits. (*Id.* at 16-18.) For the reasons set forth below, this Court finds that petitioner's claim of ineffective assistance of counsel is without merit.

### a.    Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: that (1) "counsel's representation fell below an objective standard of reasonableness," *Id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "'A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision,'" *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (citing *Strickland*, 466 U.S. at 690-91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermine[s] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no

effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

This Court proceeds to examine petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

b.       Claims of Matters Outside the Record

As an initial matter, there is no evidence on the record to support petitioner's claims of ineffective assistance of counsel based on: (1) counsel's failure to petition the court for a change of venue; (2) that counsel failed to prepare for trial; (3) that counsel refused to communicate with petitioner; and (4) that poor trial strategy led to his conviction. (Pet. Br. at 46.) As discussed *supra*, these claims are procedurally barred. However evening assuming *arguendo*, that these claims could be reviewed, petitioner has failed to demonstrate how defense counsel's failure to petition the court for change of venue; failure to prepare for trial; failure to communicate with petitioner; and poor trial strategy fell outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Thus, even if counsel's trial strategy could perhaps be questioned in hindsight, the record shows that counsel's performance was not constitutionally defective. *See Whidbee v. United States*, 09-CV-780 (CPS), 2009 WL

2242341, at *5 (E.D.N.Y. July 27, 2009) (finding complaints of "poor communication with his attorney . . . legally insufficient in the absence of some showing of prejudice resulting from the lack of communication"). Moreover, petitioner has failed to demonstrate that a prejudice resulted from the alleged misrepresentation. Accordingly, petitioner's ineffective assistance of counsel claim fails.

c.       Failure to Move to Suppress Evidence

Petitioner further contends that counsel was deficient in failing to move to suppress evidence of petitioner's prior bad acts. However, petitioner's claim lacks merit and cannot be the basis for habeas relief.

First, petitioner has not satisfied the first prong of *Strickland*. As a general matter, "[i]n order to show ineffective assistance of counsel for failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 47 U.S. 365, 375-76 (1986); se*e also Curzi v. United States*, 773 F. Supp. 535, 544 (E.D.N.Y. 1991)). In the instant case, the underlying suppression motion would not have been meritorious. As discussed *supra*, the evidence of the uncharged crime and prior bad acts were properly introduced as evidence to establish motive, and trial counsel is not required to make a motion that is without merit.

Even assuming *arguendo* that counsel's performance was deficient, petitioner is unable to demonstrate that he was prejudiced as a result. As discussed *supra*, the evidence against petitioner was

extremely strong to establish his guilt beyond a reasonable doubt. Thus, the second prong of *Strickland* cannot be met.

### d.  Remaining Alleged Errors

Petitioner contends he was denied a fair trial because of: counsel's cumulative errors; counsel's cursory cross-examination; and counsel's failure to object and preserve prejudicial evidence "such as double jeopardy." (Pet. Br. at 46.)  As an initial matter, petitioner's allegations are entirely conclusory and are wholly unsupported by the record.  Even assuming *arguendo* that counsel made cumulative errors or failed to make objections, petitioner has not satisfied the first prong of *Strickland* by showing that counsel's representation fell below an objective standard of reasonableness.

Although petitioner contends that his defense counsel did not make objections, there are strategic reasons that an attorney might "forego objections: the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences." *Taylor v. Fischer*, No. 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006.)

In the instant case, during the prosecution's summation, defense counsel made objections in several instances (*See, e.g.*, Tr. at 1837), which indicates that the choice not to object at other times "was driven by strategy." *Nova v. Ercole*, No. 06-CV-562 (NRB), 2007 WL 1280635, at *8 (S.D.N.Y Apr. 30, 2007).  Counsel may have determined that an objection was not necessary because she had no reason to believe that anything discussed affected the case in a material way.  Furthermore, as to petitioner's claim regarding counsel's failure to raise a double jeopardy objection, as discussed *supra*, petitioner's double jeopardy claim is without merit.

Furthermore, the Court finds petitioner has failed to demonstrate that defense counsel's cross-examination of witnesses fell outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  The record reveals that counsel cross-examined more than half a dozen witnesses and his conduct is that regard was not objectionably unreasonable.

Thus, even if counsel's cross-examination strategy could perhaps be questioned in hindsight, the record shows that counsel's performance was not constitutionally defective. *See Singleton v. Davis*, 308 F. App'x 560, 562 (2d Cir. 2009) (finding state court did not unreasonably apply *Strickland* to find trial counsel was not ineffective where "[t]he record demonstrates that counsel's failure to object to the admission of second-hand accounts of the offense –  his decision to elicit hearsay at least one instance – was part of a strategy designed to highlight for the jury what defense counsel perceived to be an inconsistency between the victim's testimony and the physical evidence presented by the prosecution"); *Loliscio v. Goord*, 263 F.3d 178, 195 (2d Cir. 2001) ("[I]n case after case, we have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." (internal quotation marks and citations omitted)).

In any event, even assuming *arguendo* that petitioner was able to show that counsel's performance was deficient, petitioner cannot show that he was

prejudiced by such deficiency.  As discussed *supra*, the evidence of petitioner's guilt was extremely strong and, therefore, there is no reason to believe that absent the alleged deficiency the jury would have reached a different conclusion. *See Butts v. Walker*, No. 01-CV-5914 (JG), 2003 WL 22670921, at *8 (E.D.N.Y. Nov. 6, 2003). Thus, petitioner cannot satisfy the second prong of *Strickland*.

Accordingly because petitioner has not demonstrated that he was denied effective assistance of counsel or that he was prejudiced by any of counsel's alleged deficiencies, petitioner's claim for habeas relief on this ground fails.

### IV. CONCLUSION

For the reasons set forth herein, the Court finds that the petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254.  All of petitioner's claims are plainly without merit.  Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  April 27, 2012
       Central Islip, New York

* * *

Petitioner is proceeding *pro se*.  Respondent is represented by Kathleen M. Rice, District Attorney of Nassau County, by Tammy J. Smiley, 262 Old Country Road, Mineola, New York, 11501.